**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------- X

ROSS JACKSON and THE GARY A.   :
ZEBROWSKI LIVING TRUST,       :
                                  :

         Plaintiffs,      :

                                  :

  -against-          :     No. 17 Civ. 5276 (JFK)

                                  :     **OPINION & ORDER**

HARVEST CAPITAL CREDIT      :
CORPORATION and CHRISTALS    :
ACQUISITION, LLC,         :

                                  :

         Defendants.     :
------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 02/12/2020

<u>APPEARANCES</u>

FOR PLAINTIFFS ROSS JACKSON & THE GARY A. ZEBROWSKI LIVING TRUST:
    John A. Hutchings
    DILL DILL CARR STONBRAKER & HUTCHINGS, P.C.
    Yelena Graves
    STRONGIN ROTHMAN & ABRAMS, LLP

FOR DEFENDANT HARVEST CAPITAL CREDIT CORPORATION:
    S. Wade Malone
    Lucas A. Westby
    Peter L. Munk
    NELSON MULLINS RILEY & SCARBOROUGH LLP

**JOHN F. KEENAN, United States District Judge:**

    Plaintiffs Ross Jackson and the Gary A. Zebrowski Living Trust (together, "Plaintiffs") bring this diversity action against Defendants Harvest Capital Credit Corporation ("Harvest") and Christals Acquisition, LLC ("Christals") alleging common law breach of contract. Before the Court are (1) Plaintiffs' motion to withdraw their jury demand and strike Harvest's jury demand; (2) motions by Harvest to exclude certain

1

expert testimony; and (3) cross-motions by Plaintiffs and Harvest for summary judgment.  Christals filed for bankruptcy soon after Plaintiffs initiated this action, and it has not entered an appearance or otherwise responded to the Complaint. For the reasons set forth below, Plaintiffs' motion for summary judgment is DENIED; Harvest's motion for summary judgment is GRANTED.  Plaintiffs' and Harvest's other motions are DENIED as moot and this action is stayed until the bankruptcy proceedings against Christals are resolved.

## I.  Factual Background

The relevant facts are largely undisputed, and the following is drawn principally from the parties' statements pursuant to Local Civil Rule 56.1[1] and from the relevant contract documents themselves, the terms of which are not in dispute. Specifically, the Court has relied on: (1) Plaintiffs' 56.1 statement (Pls.' Statement of Undisputed Material Facts ("Pls.' 56.1"), ECF No. 117); (2) Harvest's response to Plaintiffs' 56.1 statement (Def.'s Resp. to Pls.' Statement of Undisputed

_____

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b).

Material Facts ("Def.'s 56.1 Resp."), ECF No. 120); (3)

Harvest's 56.1 statement (Harvest Cap. Credit Corp.'s Statement

of Material Facts on Summ. J. ("Def.'s 56.1"), ECF No. 124); (4)

Plaintiffs' response to Harvest's 56.1 statement (Pls.' Resp. to

Harvest Cap. Credit Corp.'s Statement of Material Facts on Summ.

J. ("Pls.' 56.1 Resp."), ECF No. 127); and (5) the exhibits

attached to Plaintiffs' Declaration of Counsel in Support of

Summary Judgment Motion ("Pls.' Decl."), ECF No. 115.[2]

## A. The Christals Purchase

In 2012, Plaintiffs entered into a Purchase Agreement with

Christals ("the Purchase") pursuant to which Plaintiffs sold

their interests in nine individual stores in the former

"Christals" retail chain. (Pls.' 56.1 ¶ 1; Def.'s 56.1 ¶ 1.)

The sales price for the assets Plaintiffs sold, together with

the sale of other assets included in the Purchase, was $6.8

million. (Pls.' 56.1 ¶ 2.) Half of the purchase price ($3.4

million) was paid in cash; the other half was paid in the form

of Unsecured Subordinated Promissory Notes ($3.1 million) and

Contingent Subordinated Promissory Notes ($300,000) (together,

"the Promissory Notes"). (Id.) The Promissory Notes' maturity

date was January 9, 2017. (Id. ¶¶ 4-7.)

---

[2] Where possible, the Court has relied on the undisputed facts in
Plaintiffs' 56.1 statement or 56.1 response. Unless otherwise noted,
citations herein to one party's 56.1 statement alone indicates that
the cited factual assertion is not in dispute.

To partially finance the Purchase, Christals sought and received debt financing in the amount of $3.13 million from Harvest ("the Harvest Loan") pursuant to a Securities Purchase Agreement ("the Harvest Loan Agreement" or "the HLA"). (Def.'s 56.1 ¶ 2.) The Harvest Loan's maturity date was October 9, 2016, but Christals had the discretion to redeem the Harvest Loan prior to maturity. (Id. ¶ 3; Pls.' 56.1 Resp. ¶ 4.) Pursuant to the HLA, Harvest received a Senior Secured Promissory Note ("the Senior Note") in the amount of $4.63 million.[3] (Pls.' 56.1 ¶ 15.)

**B. The Subordination Agreement**

Simultaneous to the Purchase and Harvest Loan, Plaintiffs, together with Harvest, Christals, and each of Christals' then-subsidiaries, entered into a Subordination Agreement ("the SA") under which Plaintiffs agreed to subordinate the Promissory Notes to the Harvest Loan. (Def.'s 56.1 ¶ 10.) Section 4(b) of the SA provided in part:

> [Harvest] may at any time and from time to time, without the consent of or notice to [Plaintiffs], without incurring liability to [Plaintiffs] and without impairing or releasing the obligations of [Plaintiffs] under [the SA], do any one or more of the following: . . . (ii) sell, exchange, release, or otherwise deal with any property pledged or mortgaged to secure or otherwise securing Senior Indebtedness [i.e., the Harvest Loan.]

---

[3] As recounted above, the Harvest Loan was $3.13 million. The remaining $1.5 million of the Senior Note was never issued by Harvest. (Pls.' 56.1 ¶ 16.)

(Id. ¶ 12, 13; Ex. A to Pls.' Decl. ("The SA"), ECF No. 115-1, § 4(b).) And,

> [Harvest] agrees that it shall not amend or modify the Senior Note Documents, or consent or grant any waiver thereunder, which would allow [Christals and its subsidiaries] to incur additional Indebtedness to Persons other than [Harvest] which is senior to the [Promissory Notes] other than (i) Indebtedness in a principal amount not exceeding $2,000,000[.]

(Def.'s 56.1 ¶ 12; Pls.' 56.1 ¶ 111; The SA § 4(b).)

> Section 16 of the SA, titled "Termination", stated:

> [The SA] shall remain in full force and effect until the indefeasible payment in full in cash of all Senior Indebtedness [i.e., the Harvest Loan] and the termination of all commitments to lend or otherwise extend credit under the Senior Debt Documents, after which [the SA] shall terminate without further action on the part of the parties hereto.

(Def.'s 56.1 ¶ 13; Pls.' 56.1 ¶ 64; The SA § 16.)

On October 9, 2012, the Purchase was consummated, and the Harvest Loan, the Promissory Notes, and the SA were executed by the parties. (Def.'s 56.1 ¶ 14.)

### C. The Peekay Deal

On December 31, 2012, Christals, its subsidiary, Peekay Acquisition, LLC ("Peekay Acquisition"), and certain other subsidiaries of both entities, entered into a Financing Agreement (the "Peekay Financing Agreement" or "the PFA") under which Christals received approximately $38 million in term loans to partially finance its acquisition of the "Peekay" store chain (the "Peekay Deal"). (Id. ¶ 15.) The PFA provided for the

making of Term A Loans in the amount of $27 million and Term B Loans in the amount of approximately $11.2 million. (Pls.' 56.1 ¶ 82.) Section 5.01(d)(xxiii) of the PFA also established, as a condition precedent to the effectiveness of the agreement, that the Harvest Loan was to be paid in full. (Pls.' 56.1 Resp. ¶ 16.)

On the same day as the Peekay Deal, Christals and Harvest entered into a Payoff Letter ("the Payoff Letter") which stated that, as of December 31, 2012, Christals owed the following amounts for the Harvest Loan:

| | |
|---|---|
| Principal Balance | $3,130,000.00 |
| Cash Pay Interest | $39,081.52 |
| PIK Interest | $28,865.56 |
| Unused Line Fee | $13,833.33 |
| Total | $3,211,780.41 |

(Pls.' 56.1 ¶¶ 96–97; Def.'s 56.1 ¶ 18; Ex. Q to Pls.' Decl. ("The Payoff Letter"), ECF No. 115-17, Table A.) The PFA also stated that Christals owed Harvest $3,211,780.41 as of December 31, 2012. (Pls.' 56.1 Resp. ¶ 20.)

Pursuant to ¶ 3(ii) of the Payoff Letter, "to avoid multiple wire transfers and to provide for an efficient closing, the parties wish[ed] to eliminate certain unnecessary wire transfers." (Def.'s 56.1 ¶ 21; The Payoff Letter ¶ 3(ii).) Accordingly, Christals and Harvest agreed to consolidate the $3,211,780.41 payment to Harvest for the Harvest Loan with a $2 million payment ("the Participation Amount"), less certain fees,

from Harvest for Term B Loans made pursuant to the PFA ("the Participation") into a "Total Net Wire Amount". (The Payoff Letter ¶ 3(ii), Schedule 1.) This "Netting Transaction" resulted in one wire payment to Harvest of $1,456,280.41, which was calculated by subtracting the $1,755,500.00 that Harvest was "deemed" to have paid for the Term B Loans—*i.e.*, the $2 million Participation Amount, less fees paid by Peekay Acquisition—from the $3,211,780.41 that Harvest was owed for the Harvest Loan. (*Id.* ¶ 3(ii), Schedule 1; Def.'s 56.1 ¶ 23.) The cash wire transfer, together with the Netting Transaction, constituted payment in full of the Harvest Loan, (Pls.' 56.1 Resp. ¶ 24; Def.'s 56.1 ¶ 24), and served to extinguish the Harvest Loan, (Pls.' 56.1 Resp. ¶ 29; Def.'s 56.1 ¶ 29).[4] As a result, all of Harvest's liens in the assets of Christals and its subsidiaries were terminated. (Def.'s 56.1 ¶ 40.)

Paragraph 3(i) of the Payoff Letter also established, as conditions precedent to the effectiveness of the agreement,

> payment of the [$3,211,780.41 Harvest Loan] . . . in the
> following manner: (1) payment of the [$1,456,280.41]
> Total Net Wire Amount . . . ; (2) the purchase of the
> [Term B Loans] by [Harvest] . . . ; and (3) payment by

---

[4] As discussed below, "Plaintiffs admit [that] such [a] netting transaction produced the same result as if the parties had used two (2) gross wires." (Pls.' 56.1 Resp. ¶ 33.) Plaintiffs, however, argue that the Netting Transaction described in ¶ 3(ii) of the Payoff Letter "did not produce the same result as if the parties used two (2) gross wires [with respect] to the provisions of the [SA] . . . [because] it did not fulfill the [SA's] requirement of 'payment in full in cash.'" (*Id.*)

Peekay Acquisition of [certain fees relating to the Participation].

(The Payoff Letter ¶ 3(i), Schedule 1.)

For accounting purposes, Harvest treated the Harvest Loan payoff and the Participation as separate wire transfers, creating one journal entry for "Pay-off of Christals" in the amount of $3,211,780.41, and one journal entry for "Funding of Peekay/Christals" in the amount of $2 million. (Def.'s 56.1 ¶ 37.)

### D. Plaintiffs' Damages

As part of the Peekay Deal, Christals pledged to the transaction's collateral agent, Cortland Capital Markets, LLC, on behalf of the Term A and Term B Lenders, all of its ownership interests in the assets that it had previously pledged to Harvest under the Harvest Loan. (Pls.' 56.1 ¶¶ 90–91.) Christals also incurred additional indebtedness of more than $38 million in the process. (Id. ¶¶ 112–13.) Pursuant to the PFA, the "Final Maturity Date" for the Term A Loans and Term B Loans was December 27, 2015, but this maturity date was later extended by the Term A and B lenders on several occasions pursuant to amendments to the PFA. (Id. ¶¶ 153–54.)

In the years after the Peekay Deal, Christals struggled to remain profitable. (Id. ¶ 159.) With respect to the Harvest Loan, which had terminated on December 31, 2012, the total debt

service obligation that would have been required to satisfy the loan when it matured on October 9, 2016, would have been $5,579,692 ($2,449,692 in accrued interest, together with the $3.13 million principal). (Def.'s 56.1 ¶ 44.) From December 31, 2012, to October 9, 2016, however, the total cash flows for the original nine Christals stores that would have been available for servicing Christals' debt was $4,737,582—$842,110 less than the obligations due on the Harvest Loan at its maturity. (Id. ¶¶ 45–46.) Janet Mathews ("Mathews"), who served as the Chief Financial Officer of Peekay, Inc. from April 20, 2014 to December 9, 2016, testified that, by early January 2016, Christals was aware it was going to default on its loans and it attempted to find buyers for the company, but the effort was unsuccessful because Christals had too much debt. (Pls.' 56.1 ¶¶ 155, 164–65.)

On January 9, 2017, Christals defaulted on the Promissory Notes by failing to pay all principal and interest in accordance with the notes' terms. (Id. ¶¶ 10–11.) On August 10, 2017, Christals, together with numerous affiliated entities, initiated bankruptcy proceedings in the U.S. Bankruptcy Court for the District of Delaware. (Id. ¶ 13.) Mathews testified that Christals filed for bankruptcy because of its inability to repay the Term A Loans and Term B Loans. (Id. ¶ 169.)

### E.  Procedural History

On July 12, 2017, approximately one month before Christals filed for bankruptcy, Plaintiffs initiated this action, (ECF No. 1), and on July 24, 2017, they filed a "Corrected Complaint" which included certain exhibits that Plaintiffs had erroneously omitted from their initial filing, (ECF No. 11).  The Corrected Complaint asserted one count against Christals for breach of the Promissory Notes, and one count against Harvest for breach of the SA.  Plaintiffs allege that Harvest's conduct in connection with the Peekay Deal breached § 4(b) of the SA by permitting Christals to incur additional indebtedness to persons other than Harvest, which was senior to the Promissory Notes and in excess of $2 million.

On August 29, 2017, Harvest moved to dismiss the Corrected Complaint.  (ECF No. 22.)  On April 30, 2018, the Court denied Harvest's motion, (ECF No. 43), and on May 25, 2018, Harvest filed its answer, which included a demand for a jury trial, (ECF No. 48).  On May 30, 2018, Plaintiffs filed a separate demand for a jury trial "on all issues."  (ECF No. 49.)

The parties proceeded to discovery, which was completed on or around December 20, 2018, for all fact discovery, and March 15, 2019, for expert depositions.  On April 5, 2019, Plaintiffs filed a combined motion to withdraw their jury demand and strike Harvest's jury demand, (ECF No. 91), to which Harvest filed an

opposition, (ECF No. 94).  On June 13, 2019, Harvest filed three

separate motions to preclude testimony by Plaintiffs' damages

expert, Mitchell S. Hoffman, (ECF No. 98), and their accounting

experts, David D. Tawil, (ECF No. 99), and Matthew D. Lausten,

(ECF No. 100).  Plaintiffs opposed all three motions.  (ECF Nos.

101, 104, 107.)  On June 21, 2019, the parties filed cross-

motions for summary judgment.  (ECF Nos. 114, 122.)  The Court

heard oral argument on all six motions on January 14, 2020.

## II.  Cross-Motions for Summary Judgment

The Court begins its analysis with the parties' dispositive

motions for summary judgment.

### A.  Legal Standard

Summary judgment is appropriate where the moving party

shows that "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); see also Psihoyos v. John Wiley & Sons, Inc.,

748 F.3d 120, 123–24 (2d Cir. 2014).  "In determining whether

summary judgment is appropriate," a court must "construe the

facts in the light most favorable to the non-moving party and

must resolve all ambiguities and draw all reasonable inferences

against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d

Cir. 2011) (quotation marks omitted); see also Borough of Upper

Saddle River, N.J. v. Rockland Cty. Sewer Dist. # 1, 16 F. Supp.

3d 294, 314 (S.D.N.Y. 2014).

"It is the movant's burden to show that no genuine factual dispute exists." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see also Berry v. Marchinkowski, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (brackets and internal quotation marks omitted).  Further, to survive a summary judgment motion, a nonmovant "need[s] to create more than a 'metaphysical' possibility that his allegations [a]re correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial.'" Wrobel v. Cty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).  The nonmoving party "may not merely rest on the allegations or denials of his pleading." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009); see also Guardian Life Ins. Co. v. Gilmore, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried," Brod, 653 F.3d at 164 (quotation marks omitted), and "to isolate and dispose of factually unsupported claims," Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 495 (2d Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986)).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (quotation marks omitted).

When cross-motions for summary judgment are made, the standard is the same as that for individual motions. See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001); Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc., No. 14 Civ. 3770 (JFK), 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121. However, where the motion and cross-motion seek a determination

of the same issue, the Court may address them together. <u>See</u>
<u>Royal & Sun</u>, 2015 WL 5098119, at *2; <u>Chartis Seguros Mex., S.A.</u>
<u>de C.V. v. HLI Rail & Rigging, LLC</u>, 3 F. Supp. 3d 171, 179
(S.D.N.Y. 2014).

### B. Analysis

Plaintiffs and Harvest agree that no genuine dispute of
material fact exists and summary judgment is appropriate.
Naturally, both sides disagree as to who should prevail.
Plaintiffs obviously say they should win; Harvest obviously says
the opposite.  In the Court's considered judgment, the defense
prevails.  Accordingly, for the reasons set forth below, summary
judgment is granted in favor of Harvest.

"In order to recover from a defendant for breach of
contract, a plaintiff must prove, by a preponderance of the
evidence, (1) the existence of a contract between itself and
that defendant; (2) performance of the plaintiff's obligations
under the contract; (3) breach of the contract by that
defendant; and (4) damages to the plaintiff caused by that
defendant's breach." <u>Diesel Props S.r.l. v. Greystone Bus.</u>
<u>Credit II LLC</u>, 631 F.3d 42, 52 (2d Cir. 2011).  "[T]he mere
violation of a contractual provision, standing alone, does not
constitute a 'breach' under New York law.  Plaintiff also must
demonstrate that it suffered <u>damages</u> as a result of the
violation." <u>Zamora v. Morphix Co., Ltd.</u>, No. 15 Civ. 6532 (KBF),

14

2018 WL 1033228, at *7 (S.D.N.Y. Feb. 21, 2018) (vacating jury
verdict and granting judgment as a matter of law where there was
insufficient evidence to find that damages were suffered as a
result of the breach) (emphasis in original), aff'd, 764 F.
App'x 96 (2d Cir. 2019).

Neither party disputes that the SA was a valid contract
under which Plaintiffs and Harvest performed.  Plaintiffs,
however, argue that after Harvest required them to accept the
unsecured and subordinated Promissory Notes in connection with
the sale of their stores to Christals—the cash portion of which
was financed by the Harvest Loan—Harvest subsequently breached
its promise that it would not allow Christals to incur
additional debt in excess of $2 million, senior to Plaintiffs'
debt, unless and until the Harvest Loan was paid in full in
cash.  Plaintiffs' primary argument in support of summary
judgment is that the Netting Transaction did not constitute
"payment in full in cash" because the Peekay Deal merely
resulted in Harvest's receipt of some cash for the Harvest Loan,
with the rest being repaid in the form of a promissory note via
the Participation.  Accordingly, Plaintiffs argue, Harvest
breached the SA by allowing Christals to incur more than $38
million in debt through the Term A and B Loans which caused
Plaintiffs to suffer millions of dollars in damages when

Christals later defaulted on the Promissory Notes and filed for bankruptcy.

Harvest counters that it is the party entitled to summary judgment because the Netting Transaction satisfied the SA's requirement for repayment of the Harvest Loan, which terminated the SA of its own accord. Accordingly, Harvest argues, it could not have violated any provision of the SA during the Peekay Deal because the SA was no longer in effect when Christals incurred the additional debt that was senior to the Promissory Notes. Harvest also argues that Plaintiffs have failed to establish the "market value" of the Promissory Notes when the alleged breach occurred, nor how any breach by Harvest proximately caused any of Plaintiffs' loss where Christals is the party that owed the money to Plaintiffs and it was Christals' default many years after the Peekay Deal that gives rise to Plaintiffs' purported damages.

"[N]ominal damages are always available for breach of contract." T & N PLC v. Fred S. James & Co. of New York, Inc., 29 F.3d 57, 60 (2d Cir. 1994); see also NAF Holdings, LLC v. Li & Fung (Trading) Ltd., No. 10 Civ. 5762 (PAE), 2016 WL 3098842, at *17 (S.D.N.Y. June 1, 2016). Accordingly, the Court will first consider Plaintiffs' claim of breach—specifically, that the Netting Transaction did not constitute "payment in full in cash" under the SA's termination provision—before scrutinizing

16

Harvest's claim that Plaintiffs have failed to establish proximate causation or damages. Here, Plaintiffs agree that the cash wire transfer, together with the Netting Transaction, indefeasibly paid the Harvest Loan in full and served to extinguish the Harvest Loan. (Pls.' 56.1 Resp. ¶¶ 24, 29.) Accordingly, the dispositive question turns on the definition of the word "cash" in § 16, and whether the Netting Transaction satisfied it.

"[T]he initial question for the court on a motion for summary judgment with respect to a contract claim is 'whether the contract is unambiguous with respect to the question disputed by the parties.'" Law Debenture Tr. Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010) (quoting Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002)). "No ambiguity exists where the contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Id. at 467 (quoting Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989)) (alteration in original). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless

each is a 'reasonable' interpretation." Id. (citation and internal quotation marks omitted).

"Ambiguity is determined by looking within the four corners of the document, not to outside sources." JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (quotation marks omitted). "If a court concludes that the contractual terms are 'complete, clear, and unambiguous,' it must proceed to interpret those terms according to their 'plain meaning.'" Great Minds v. John Wiley & Sons, Inc., 204 F. Supp. 3d 507, 511–12 (S.D.N.Y. 2016) (quoting Law Debenture, 595 F.3d at 467). "[E]xtrinsic evidence is inadmissible to contradict an unambiguous contract." Broadway Nat'l Bank v. Progressive Cas. Ins. Co., 775 F. Supp. 123, 126 (S.D.N.Y. 1991), aff'd, 963 F.2d 1522 (2d Cir. 1992); see also Law Debenture, 595 F.3d at 467–68. "[U]nder New York law, 'a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.'" Atlas Partners, LLC v. STMicroelectronics, Int'l N.V., No. 14 Civ. 7134 (VM), 2015 WL 4940126, at *5 (S.D.N.Y. Aug. 10, 2015) (quoting Greenwich Capital Fin. Prods., Inc. v. Negrin, 74 A.D.3d 413, 415 (1st Dep't 2010)).

The Court finds that the word "cash" is unambiguous and its definite and precise meaning demonstrates that the Netting Transaction complied with the SA's requirements for repayment of

the Harvest Loan. Plaintiffs cite <u>In re Adler, Coleman Clearing Corp.</u>, 263 B.R. 406 (S.D.N.Y. 2001), to argue that Harvest did not receive payment in full in cash because "[i]n the plain meaning of the word, 'cash' requires actual funds promptly available." <u>Id.</u> at 432. <u>In re Adler</u> observed that <u>Webster's New Universal Unabridged Dictionary</u> (2d ed. 1979), "defines the term as 'money that a person actually has, including money on deposit; ready money.'" <u>Id.</u> Plaintiffs, however, ask the Court to ignore the fact that <u>In re Adler</u> also cited <u>Black's Law Dictionary</u> (6th ed. 1990), which defined "cash" as "money <u>or the equivalent</u>; usually ready money." <u>Id.</u> (emphasis added).[5] At the time the SA was executed, "equivalent" was defined as "[e]qual in value, force, amount, effect, or significance" or "[c]orresponding in effect or function; nearly equal; virtually identical." <u>Equivalent</u>, <u>Black's Law Dictionary</u> (9th ed. 2009); <u>see also</u> <u>Equivalent</u>, <u>Merriam-Webster's Collegiate Dictionary</u> (11th ed. 2011) (defining "equivalent" as, in part, "equal in force, amount, or value").

---

[5] Further, the definitions of "cash" at the time the SA was executed both now include the modifier "or its equivalent". <u>See</u> <u>Cash</u>, <u>Black's Law Dictionary</u> (9th ed. 2009) (defining "cash" as "1. Money or its equivalent. 2. Currency or coins, negotiable checks, and balances in bank accounts"); <u>Cash</u>, <u>Merriam-Webster's Collegiate Dictionary</u> (11th ed. 2011) (defining "cash" as "1: ready money" or "2: money or its equivalent (as a check) paid for goods or services at the time of purchase or delivery").

Here, the Netting Transaction constituted payment in "cash" and the "equivalent" of money because (1) Plaintiffs admit that a transfer of funds by wire is a cash payment, (Pls.' 56.1 Resp. ¶ 26), and the Netting Transaction "produced the same result [between Christals and Harvest] as if the parties had owned two (2) gross wires," (id. ¶ 33); (2) Plaintiffs' accounting expert, David D. Tawil ("Tawil"), testified that Harvest's actions would have constituted payment in full in cash if the parties had exchanged separate wire transfers in the gross amount of the Harvest Loan payoff and the Participation Amount, (Ex. UU to Pls.' Decl. ("Tawil Dep. Tr."), ECF No. 115-47, at 83:17-22, 102:16-20); and (3) the SA did not prohibit netting transactions, which are commonly used to avoid additional expenses and unexpected delay during closings; did not deny Harvest the option of reinvesting back into Christals any of the proceeds it was to receive from repayment of the Harvest Loan; and did not give Plaintiffs any right to object to the manner in which Harvest chose to use such proceeds. Accordingly, although the end result of the Peekay Deal left Harvest with money in its bank account and a promissory note in the form of a Term B loan, the way that end result was reached, together with Harvest's sole discretion to use the repayment proceeds in any way it wanted, satisfied the SA's requirement for repayment of the Harvest Loan: here, two simultaneous payments of (1) money, in

the form of an approximately $1.5 million balance increase via the wire, and (2) the equivalent of money, in the form of an approximately $1.75 million balance increase and corresponding decrease for the Term B Loans that Harvest simultaneously acquired using a pre-designated portion of the Harvest Loan repayment.

Plaintiffs counter that the Netting Transaction was a "sham" and offer deposition testimony to establish that Christals never intended to repay the Harvest Loan in one wire payment and the payoff of the loan was contingent on Harvest's participation in the Term B Loans. Such testimony, however, does not give rise to ambiguity or create a dispute that is genuine with respect to the proper interpretation of (1) "payment in full in cash" and, especially, what Plaintiffs and Harvest understood "cash" to mean when they negotiated and executed the SA approximately three months prior to the Peekay Deal, and (2) the Payoff Letter's terms regarding the netting of wire payments, both of which are clear, unambiguous, and subject to a plain meaning. See, e.g., Law Debenture, 595 F.3d at 467 ("[A] written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms, without the aid of extrinsic evidence.") (citations and internal quotation marks omitted; second alteration in original). Further, courts have specifically

ruled that simultaneous netting transactions "actually occurred" and they are not "shams" simply because of the netting aspect of the transaction. See In re CM Holdings, Inc., 301 F.3d 96, 108 (3d Cir. 2002) ("A circular netting transaction, where different loans and payments are deemed to occur simultaneously (and thereby offset each other), is not by definition a factual sham."); see also Am. Elec. Power Co. v. United States, 326 F.3d 737, 745 (6th Cir. 2003) (citing with approval In re CM Holdings). Indeed, Plaintiffs' argument "strain[s] the contract language beyond its reasonable and ordinary meaning," Bethlehem Steel Co. v. Turner Constr. Co., 141 N.E.2d 590, 593 (N.Y. 1957), where their own expert agreed that payment in full in cash would have occurred if Harvest had exchanged payments instead of netting the wires, (Tawil Dep. Tr. 102:16-20), and he agreed that netting wire payments can be "an appropriate thing to do" when closing a transaction, (id. 84:4-85:25).

Finally, the Court is persuaded that an absurd and commercially unreasonable result would arise if it adopted Plaintiffs' interpretation of § 16, which essentially boils down to acknowledging that the termination provision would have been satisfied if the parties had physically exchanged two separate payments, but the provision was not satisfied because the parties exchanged one consolidated payment—even though the final result was exactly the same and there are commercially

reasonable and prudent reasons for the one consolidated payment. "Under New York Law, the Court cannot interpret a contract so as to reach such a result." <u>Atlas Partners</u>, 2015 WL 4940126, at *12 (rejecting the plaintiff's unreasonable interpretation); <u>see also</u> <u>Cole v. Macklowe</u>, 99 A.D.3d 595, 596 (1st Dep't 2012) ("[S]uch interpretation of the agreement runs afoul of the well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties.").

Accordingly, because there is no genuine dispute that the Netting Transaction satisfied the requirement of "indefeasible payment in full in cash," and Plaintiffs agree that under such circumstances Harvest did not breach the SA by releasing its liens and allowing Christals to incur additional debt,[6] summary judgment in favor of Harvest is appropriate.

### III.   Motions to Preclude Expert Testimony and Withdraw and Strike Jury Demands

Because the Court finds that Harvest is entitled to summary judgment and dismisses Plaintiffs' claims against it with

---

[6] Plaintiffs acknowledge that, "[h]ad Harvest been paid in full in cash for its loan of $3,211,780.41 on December 31, 2012, the [SA] would have terminated, the Termination Provisions of the Security Agreement and the two (2) Pledge Agreements for the release of collateral would have become operative, and Harvest would have satisfied Section 3.2(c)(iii) of the [Harvest Loan Agreement].  In such case, no violation of Section 4(b) of the [SA] would have occurred, and Harvest could have been repaid its full indebtedness and released the collateral without breaching the [SA]."  (Pls.' Opp'n at 13.)

prejudice, the Court denies as moot Harvest's motions to preclude the testimony of Plaintiffs' expert witnesses, and it denies as moot Plaintiffs' motion withdraw their demand for a jury trial and to simultaneously strike Harvest's demand for a jury trial.

**IV. Conclusion**

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED; Harvest's motion for summary judgment is GRANTED. The parties' other motions are DENIED as moot.

The Clerk of Court is directed to terminate the motions docketed at ECF Nos. 91, 98, 99, 100, 114, and 122, and terminate Harvest Capital Credit Corporation as a defendant. The Clerk of Court is further directed to stay this action until the bankruptcy proceedings against Christals are resolved. Plaintiffs are directed to inform the Court when those proceedings are complete, or whether they wish to withdraw their claims against Christals and close this case.

**SO ORDERED.**

Dated:  New York, New York
        February 12, 2020

John F. Keenan
United States District Judge